THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA

v.

TITUS BATES,

Defendant.

CRIMINAL CASE NO.

1:13-CR-00501-ELR-JFK-1

## REPORT AND RECOMMENDATION

Pending before the court is Defendant Titus Bates' motion [Doc. 92] and supplemental brief [Doc. 142] to suppress evidence obtained as the result of the execution of a state warrant for his arrest [Doc. 94, Exhibit ("Exh.") 1 ("State Arrest Warrant")] and a state search warrant [Id., Exh. 2 (State Search Warrant and Affidavit")] and a federal search warrant [Id., Exh. 3 ("Federal Search Warrant and Affidavit")][1] for his residence located on Diana Drive, Atlanta, Georgia. The Government opposes the motion to suppress [Doc. 143], and Defendant filed a reply brief in support of his motion [Doc. 149]. Also pending before the court are

---

[1] The same exhibits are attached to Defendant's brief in support of his motion to suppress [Doc. 142, Exhs. 1, 2 and 3] and to the Government's response in opposition to the motion to suppress [Doc. 143, Exhs. 1 and 2].

Defendant's motion [Doc. 90] to dismiss Count Two of the Superseding Indictment, motion [Doc. 112] to dismiss Count Four of the Superseding Indictment and motion [Doc. 114] to dismiss both Counts Two and Four of the Superseding Indictment.  The Government responded opposing the motions to dismiss [Docs. 144, 145 and 146], and Defendant filed reply briefs in support of the motions [Docs. 147, 148 and 150].

## **Motion to Suppress**

In support of the motion to suppress the arrest warrant and the state and federal search warrants for his residence, Defendant contends that (1) he is entitled to a Franks hearing[2] because the affiant for the federal search warrant deliberately or with reckless disregard for the truth included misleading information in the federal affidavit and (2) that probable cause is lacking for all three warrants because the affidavits depend on information provided by a confidential informant without establishing the informant's reliability.  [Doc. 92; Doc. 142].  The Government opposes the motion to suppress contending that Defendant has not made a sufficient showing to entitle him to a Franks hearing and that the affidavits provide probable cause for the search.  [Doc. 143]. Defendant replied providing additional but unpersuasive arguments, for the reasons the court sets forth *infra*, why the confidential informant is not reliable and presenting two

---

[2] See Franks v. Delaware, 98 S. Ct. 2674 (1978).

2

new claims of intentional misrepresentations in the affidavit for the federal search warrant. After consideration of the arguments, of relevant legal authority, and the search warrants' affidavits, the court recommends that the motion to suppress be denied.[3]

## I.      State Search Warrant & Affidavit

The state search warrant for the residence on Diana Drive Southwest, Atlanta, Georgia ("Target Location"), authorized the seizure of evidence of committing violations of O.C.G.A. §§ 16-13-30 (purchase, possession, manufacture, distribution or sale of marijuana) and 16-15-4(a) (person associated with a criminal street gang). Law enforcement officers were authorized to seize records, documents and other

---

[3]Although Defendant also challenges the seizure of evidence obtained as a result of the execution of the state arrest warrant, there is no evidence before the court - nor argument by Defendant - that any evidence was seized as a result of execution of the arrest warrant that was not subject to seizure - and in fact was not seized - as a result of executing the two search warrants. [Docs. 92, 140 and 142]. The two state warrants were signed within minutes of each other on November 14, 2013, by the same Fulton County Magistrate Court Judge [State Arrest Warrant; State Search Warrant and Affidavit] and, according to affidavit for the federal search warrant, the state arrest and search warrants were executed simultaneously on November 21, 2013, at which time Defendant allegedly assaulted a federal law enforcement officer and barricaded himself in the residence [Federal Search Warrant and Affidavit]. Arguably, Defendant's conduct provided an additional basis for his arrest on federal charges of violating 18 U.S.C. § 111. Defendant does not refute these series of events. The court will not further address Defendant's challenge to the state arrest warrant.

3

papers relating to the manufacture, transportation, purchasing, distribution and possession of controlled substances and to the location of controlled substances; electronic devices containing information related to identification and location of those associated in buying and selling controlled substances; proceeds of distribution of controlled substances; drug paraphernalia related to controlled substances; and weapons which may be used to protect and/or guard controlled substances, proceeds and related items. [State Search Warrant].

In support of the warrant, City of Atlanta Police Department ("APD") Officer ("Off.") Chris Kettel provided the following information. Off. Kettel advised that he had been an officer for three years and was currently assigned to the APD Gang Unit, that he had received training in high risk warrant entry and tactics, gang investigations, advanced gang prosecutions and gang testimony, undercover operations, criminal procedure and warrants and affidavits. In the Gang Unit, he is in daily contact with narcotics and gang members "ranging from the possession Of narcotics to the sales and distribution Of narcotics along with possession Of weapons and other Gang affiliated material." Previously, he was assigned to the Zone 3 Crime Suppression Unit entry team resulting in his assistance with over forty narcotic search warrants and execution of the warrants. [State Affidavit, Introduction]. Based on this training and experience,

4

Off. Kettel states that he is "familiar with the strategy, tactics, methods, and techniques employed by persons engaged in the distribution, possession, manufacture and sale Of illegal narcotics and the participation Of Criminal Gang Activity." [Id.].

Off. Kettel identified the other law enforcement officers, federal and state, providing information to him in support of the warrant, including, Sgt. Sinks, who based on his experience has extensive knowledge regarding narcotics distribution. [Id. ¶ 1]. In October 2013, an investigator relayed complaints from concerned citizens about traffic in and out of the Target Location and advised that excessive gang tagging and graffiti was located near the Target Location. [Id. ¶ 2]. In November 2013, Off. Kettel, accompanied by other law enforcement officers, drove through the Target Location's neighborhood and observed large amounts of tagging and graffiti associated with the "Crip" gang, as identified by the "6 point stars that were spray painted . . . using blue in color." [Id. ¶ 3].

Between October 31, 2013, and November 3, 2013, Off. Kettel and other Gang Unit officers conducted a purchase of marijuana from the Target Location using a confidential source ("CS"). Before the October 2013 transaction, the CS was searched for contraband and weapons and was then driven to the location by an undercover police officer, who watched the CS until he entered the Target Location. The CS

spoke to "tight," later identified as Titus Bates, confirming the amount of the marijuana and price; then the CS purchased 1.025 ounces of marijuana from Bates for $300, official funds, as the officers listened "through audio capabilities" to the transaction taking place and to the CS and Bates discussing future transactions.  After completing the transaction, the CS was searched and the quantity of marijuana was seized and field tested positive for marijuana.  The officers observed a Ford Taurus parked in the driveway of the Target Location which, when checked, was registered to Titus Bates. The CS also identified Bates' driver's license photograph as the person who sold the marijuana.  Off. Kettel also stated, "The CS stated that while they were inside Of the location they observed a black in color Glock Pistol with an extended magazine and that Mr. Bates advised he had a 'chopper' which is commonly referring to some form Of assault rifle."  [Id. ¶ 4].

And Off. Kettel recounted that between November 5, 2013, and November 7, 2013, another purchase of marijuana took place at the Target Location involving the CS.  Again, the CS was searched before the transaction for contraband and extra funds - none being found, was provided with $170 in official funds (based on the discussions he had with Bates before the transaction), was driven by the undercover officer to the location and met with Bates in the location.  While the officers monitored the

6

transaction with audio capabilities, the CS purchased 2.18 ounces of marijuana and then exited the location to be immediately driven away by the undercover officer. The marijuana and $20 was seized from the CS and field tested positive for marijuana. The CS advised that Bates "was affiliated with Block 125 Entertainment which [the officer stated has] some Gang symbols in their lyrics and through tattoos which are Blood affiliated." [Id. ¶ 5].

Off. Kettel advised that he researched Block 125 Entertainment and observing Youtube videos heard members following Block 125 Entertainment yelling the word "BLATT which is a common term for Blood gang members" standing for "Blood Loyalty All The Time." Additionally, the Target Location is within "the heart Of Raised on Cleveland Territory" which participates in the sale of narcotics and offers protection for those selling narcotics. Based on working in the area of Cleveland Avenue, where the Raised on Cleveland originated, for three years and debriefing multiple gang members, Off. Kettel stated that the members offer protection for drug distributors and receive profits for the purchase of weapons and that the gang is affiliated with the Bloods and other gang "sets" in the area. [Id. ¶¶ 5-6].

7

The officer concluded that "[b]ased upon the facts and circumstances outlined above, [he] believed it reasonable to conclude that the [Target Location] is involved in the distribution Of an illegal substance . . . ."[4]  [Id. ¶ 7].

## II.    Federal Search Warrant & Affidavit

On November 21, 2013, at 12:25 p.m., Special Agent Tyra Cunningham, Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), obtained a federal search warrant for the Target Location from Magistrate Judge Alan J. Baverman.  [Federal Search Warrant].   The warrant authorized the agents to search for evidence of violations of 18 U.S.C. § 111 (assault on a federal officer) and 21 U.S.C. § 841 (drug distribution), including, any and all firearms used in the assault on a federal officer in the performance of his duties and the seizure of any and all narcotics, currency and electronic devices used to further drug trafficking activity.  [Id.].

In support of the warrant, Agent Cunningham first provided his background since January 2010 with the ATF including conducting criminal investigations of firearms, narcotics and arson and assisting state and local investigations related to the

---

[4]Defendant points out that Off. Kettel identifies the illegal substance as "specifically Cocaine, and crack cocaine." [Doc. 142 at 5 n.1 (citing State Affidavit)]. The court finds this to be an immaterial typographical error.  As noted, the search warrant and affidavit, elsewhere, specifically refer to the drug in question being marijuana.  [State Search Warrant and Affidavit].

same activities.  [Federal Affidavit ¶ 2].  Agent Cunningham began by summarizing the two controlled purchases of marijuana from the Target Location on or about October 31, 2013, and November 5, 2013.  On the first purchase, conducted after a citizen complaint about heavy traffic at the residence, the CS spoke to Bates at the location and set up the transaction to purchase 1.025 ounces of marijuana for $300 and then made the purchase with police issued confidential funds.  The CS and Bates also discussed future transactions.  The agent relayed information provided by the CS that he "observed a handgun with an extended magazine on a mantel underneath the television in the living room" and that "BATES stated he also had a 'chopper' (aka assault rifle)."  The CS also advised that Bates said "that if the cops come to his home, 'they had better bring SWAT'" because he was not going back to jail."  [Id. ¶¶ 4-5].  On the second transaction, the CS returned to the Target Location and, using police issued confidential funds, purchased 2.18 ounces of marijuana for $170.  [Id. ¶ 6].

The CS also advised that Bates is affiliated with Block 125 Entertainment, which was connected by law enforcement with the "Blood" street gang.  Law enforcement also determined, from posted YouTube videos, that the Target Location is in "the heart of the 'Raised on Cleveland' Territory, which is known for high

9

narcotics sales activity" and "for providing protection for people that do sell narcotics." [Id. ¶ 7].

Agent Cunningham advised that based on this information, APD officers obtained a search warrant for the Target Location, authorizing the search "for illegal narcotics, firearms, books, ledgers and electronic devices and U.S. Currency[,]" and an arrest warrant for Bates signed on November 14, 2013. [Id. ¶ 8]. On November 21, 2013, at 6:45 a.m., the United States Marshals Service ("USMS") and the Southeast Regional Fugitive Task Force ("SERFTF") along with APD Gang Unit executed the state arrest and search warrants and, while attempting to do so, Bates "discharged a firearm after police announced their presence." USMS Task Force Officer ("TFO") Clay Hobbs was injured by gunfire, and Bates barricaded himself in the residence. Law enforcement officers "could hear BATES drop the firearm in the basement area of the residence" which was secured by the officers. The agent stated that no one else was inside the residence. [Id. ¶ 9].

Finally, noting that the APD Gang Unit has a search warrant for the residence, Agent Cunningham stated that he sought the federal warrant to ensure compliance "with the Fourth Amendment and other applicable laws."

Additional facts will be set forth as necessary during discussion of the motion to suppress.

## III.   Discussion

### a.   Federal Search Warrant <u>Franks</u> Hearing and Probable Cause

Defendant contends that due to the inclusion of materially false information in the affidavit for the federal search warrant, he is entitled to a <u>Franks</u> hearing.  [Doc. 92 at 5-6; Doc. 142 at 5-6].[5]  Defendant contends that Agent Cunningham's statements that, on October 31, 2013, (1) the CS "observed a handgun with an extended magazine on a mantel underneath the television in the living room" of the Target Location and (2) Defendant stated to the CS that he had a "chopper" - an assault rifle - and that "if the cops come to his home, 'they had better bring SWAT' because he was not going back to jail[,]" are false.  [Doc. 92 at 4; Doc. 142 at 5 (quoting Federal Affidavit)].  In support of the alleged falsity of the statements, Defendant contends that the recording of the transaction at the Target Location does not show a handgun with an extended magazine and does not include Defendant saying that he had an assault rifle or that the police will need SWAT to arrest him or that he will not go back to jail.  Defendant also

---

[5]Defendant does not raise a <u>Franks</u> issue with the state search warrant and affidavit.  [<u>Id.</u>].

points out that the CI's written statement does not recount Defendant making these statements.[6]   [Doc. 92 at 5-6; Doc. 142 at 6].

In <u>Franks</u>, 98 S. Ct. 2674, the Supreme Court held that where a defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by an affiant in a search warrant affidavit, and if the allegedly false statement was necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request to determine admissibility of the fruits of the search.  <u>Franks</u>, 98 S. Ct. at 2684-85; <u>see also</u> <u>United States v. Sarras</u>, 575 F.3d 1191, 1218 (11th Cir. 2009).  "[T]o prevail in a <u>Franks</u> challenge one must establish (1) that information contained in an affidavit was untrue, (2) that inclusion of the untrue information was either deliberate or in 'reckless disregard for the truth,' and (3) that the untrue information was an essential element

---

[6]Defendant notes that, instead, Defendant made the statement, "I jumped out on a n**** looking like a g**damn SWAT team."  And that the CS stated, "He said he jump out on your ass looking like SWAT . . . .  He said he jumped out on that dude looking like SWAT." [Doc. 142 at 6 (quoting Exh. 4 (recording of transaction))].  Also, according to Defendant, the CS's written statement recounts that Bates said "he 'wasn't worried about a n**** because he looked just like them with vest and helmets.'" [<u>Id.</u> at 6].  Defendant then refers to the testimony of Off. Kettel, who is not the affiant on the federal search warrant, at the hearing on the now withdrawn motion to suppress identification testimony.  The cited testimony basically affirms the information recounted by Agent Cunningham in the federal affidavit.  [<u>Id.</u> (citing Doc. 135 at 27, 46)].

12

of the probable cause showing relied upon by the judicial officer in issuing the search warrant." O'Ferrell v. United States, 253 F.3d 1257, 1267 (11th Cir. 2001) (citation omitted).

> Accordingly, to mandate a Franks evidentiary hearing,

> the [defendant's] attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons. Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained. Allegations of negligence or innocent mistake are insufficient. The deliberate falsity or reckless disregard whose impeachment is permitted . . . is only that of the affiant, not of any nongovernmental informant. Finally, if these requirements are met, and if, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required. On the other hand, if the remaining content is insufficient, the defendant is entitled, under the Fourth and Fourteenth Amendments, to his hearing. Whether he will prevail at that hearing is, of course, another issue.

Franks, 98 S. Ct. at 2684-85. The court, when applying this standard to Defendant's request for a Franks hearing, finds that Defendant has not made a substantial preliminary showing that material misrepresentations were intentionally and/or recklessly included in the federal affidavit or, alternatively, a showing that such alleged

13

misrepresentations undermined the probable cause otherwise set forth in the affidavit as necessary for a Franks hearing to be held.

Defendant, as noted, contends that Agent Cunningham included material misrepresentations in the federal affidavit regarding the CS observing a handgun with an extended magazine on the mantel in the Target Location and Defendant Bates advising the CS that he had an assault rifle and that the cops need to bring SWAT if they come because he is not going back to jail.  [Doc. 92 at 5-6; Doc. 142 at 5-6].  To undermine the accuracy of these statements by Agent Cunningham, Defendant argues that the recording of the October 31, 2013, transaction at the Target Location does not show such a handgun and, along with the CS's written statement of the transaction, does not include Defendant's alleged statements about having an assault rifle, about needing SWAT or about going back to jail.  [Id.].  For the purpose of resolving the motion to suppress, the court will accept Defendant's conclusions regarding what is depicted on the recording and set forth in the CS's written statement.  The problem for Defendant's offer of proof is that he presents nothing to demonstrate that the affiant on the federal affidavit, Agent Cunningham, had any knowledge of or personally reviewed the recording of the October 31, 2013, transaction or had personal knowledge of the CS's written statement.  See United States v. Angulo-Hurtado, 165 F. Supp. 2d

14

1363, 1374 (N.D. Ga. 2001) ("It is Defendants' burden at this juncture to make some affirmative showing *both* that the statement [in the affidavit] was false . . . *and* that affiant had some basis for knowing that it was false.") (emphasis added).

In the federal affidavit, Agent Cunningham states that "[t]he facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses." [Federal Affidavit ¶ 4]. He does not say anything about examining or reviewing the recordings of the transactions involving the CS, speaking to the CS or being aware of any other information that would call into question the information he obtained from the APD officers working the case on Defendant Bates prior to obtaining the state arrest and search warrants.[7] In fact, Defendant's offer of Off. Kettel's testimony [Doc. 135 at 27, 46] only affirms the information apparently relayed to Agent Cunningham about the handgun and

---

[7]In fact, circumstances would indicate that he did not have time to engage in fully examining the background investigation leading up to the Fulton County Magistrate Judge authorizing Defendant's arrest and the search of the Target Location. On November 21, 2013, at 6:45 a.m., federal and local officers attempted to execute those warrants with Defendant responding by firing at the officers and barricading himself in the residence. [Federal Affidavit ¶ 9]. Within six hours, it is reasonable to conclude that Agent Cunningham gathered readily available information, met with a federal prosecutor in order to discuss the information provided by local officers and the events of that morning and then drafted a federal search warrant and affidavit for presentation to Judge Baverman at 12:25 p.m. [Federal Search Warrant].

15

Defendant's statements and does not undermine the agent's reliance on what he was told about the transactions. As noted, Defendant must present sufficient proof that Agent Cunningham included in the affidavit untrue information either deliberately or in "'reckless disregard for the truth[.]'" O'Ferrell, 253 F.3d at 1267 (citation omitted). Defendant has failed to articulate a basis for calling into question Agent Cunningham's reasonable reliance on the information provided to him by other sworn law enforcement officers or to establish that he was at least reckless to include that information in the federal affidavit. See, e.g., Zargari v. United States, 658 Fed. Appx. 501, 506-07 (11th Cir. 2016) (rejecting the defendant's challenge to probable cause in the arrest warrant based on alleged false statements included by the affiant, the court noted that the affiant pointed out in the affidavit that another officer had witnessed the events recounted and challenged by the defendant and stated that "[e]ven if [that officer] knew these events did not take place, his lies cannot support an inference that [the affiant] had any reason to believe that [the officer] was untrustworthy absent plausible factual allegations to that effect") (citing Franks, 98 S. Ct. at 2681); United States v. Rivera, 524 Fed. Appx. 821, 826 (3rd Cir. 2013) (rejecting the defendant's unsubstantiated contentions in seeking Franks hearing that the affiant should have questioned the veracity of the informant's information because the defendant "offered

16

no evidence that the detective who provided the affidavit either knew that the information [from the informant] was not true or recklessly disregarded its falsity"); United States v. Jones, 208 F.3d 603, 607 (7th Cir. 2000) ("'[T]he fact that a third party lied to the affiant, who in turn included the lies in a warrant affidavit, does not constitute a Franks violation.  A Franks violation occurs only if the affiant knew the third party was lying, or if the affiant proceeded in reckless disregard of the truth.'") (citation omitted).  The fact that Defendant responded to law enforcement's presence at this residence consistent with the information provided to Agent Cunningham, that is, by firing shots at the officers and barricading himself in the residence, further supports a finding that the agent's reliance on the information he was provided was reasonable.

As noted, in his reply brief, Defendant argued that two more statements in the federal affidavit are intentionally misleading.  [Doc. 149 at 2-3].  The court first notes that these new arguments are not properly before the court having not been made in Defendant's prior briefing and the Government not having the opportunity to respond. However, the court will nonetheless address these unsubstantiated claims of intentional misrepresentations of fact which fail to establish grounds for a Franks hearing. Defendant contends that Agent Cunningham's statement that Defendant "barricaded"

17

himself in the residence was misleading because Defendant did not do so.  Without presenting any sworn statement or other offer of proof, Defendant's counsel simply opines, "Instead, [Defendant] was reluctant to come to the door once he realized that he may have shot an officer and thought the officers would retaliate by shooting him." [Doc. 149 at 2].  The allegations by Defendant's counsel in the reply brief in support of the motion to suppress, "without more, cannot be considered by the Court in making up for [the] deficiency" in providing no offer of proof.  United States v. Underwood, 2011 WL 2036498, at *1 (M.D. Fla. May 24, 2011).  And, frankly, Defendant is just arguing that a different interpretation should be placed on his conduct than Agent Cunningham's interpretation - or most likely the interpretation of the officers at the scene and relayed to the agent - without providing any basis for the court to find that the agent intentionally or with reckless disregard misstated Defendant's conduct the morning of November 21, 2013.  The court does not even find that this statement is misleading much less included by the agent either intentionally or with deliberate recklessness.

    And Defendant claims that Agent Cunningham's statement that "law enforcement heard Mr. Bates drop the firearm into the basement" is false because the government produced reports, after the fact, reflecting that "officers found the firearm

18

while conducting a plain view search of the residence after [Defendant's] arrest and before the federal search warrant was issued." [Doc. 149 at 2-3]. First, the report does not conflict with the statement in the affidavit. Second, if the information in the report cited by Defendant was included in the affidavit, probable cause would not have been undermined. And, third, Defendant makes no offer of proof that Agent Cunningham was aware of the information contained in the report when he prepared the federal affidavit and presented the federal search warrant to Judge Baverman. See Zargari, 658 Fed. Appx. at 506-07. Again, the court does not find the statement in the affidavit misleading or that the agent included the statement either believing it to be false or with deliberate recklessness. Defendant's belated arguments are woefully lacking.

And the facts set forth in the federal affidavit support the Magistrate Judge's finding of probable cause even if the statement about the handgun with the extended magazine and Defendant's alleged statements about the "chopper" and the SWAT team are omitted. The allegedly "untrue information was [not] an essential element of the probable cause showing relied upon by the judicial officer in issuing the search warrant." O'Ferrell, 253 F.3d at 1267. The issuing magistrate judge, in deciding whether to sign a search warrant, is "'simply to make a practical, common sense decision whether, given all the circumstances set forth in the affidavit before him,

19

including the veracity and the basis of knowledge of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" United States v. Jiminez, 224 F.3d 1243, 1248 (11th Cir. 2000) (quoting Illinois v. Gates, 103 S. Ct. 2317, 2332 (1983)) (internal quotation marks omitted).  In this regard, "'probable cause is a fluid concept – turning on the assessment of probabilities in particular factual contexts[.]'"   United States v. Brundidge, 170 F.3d 1350, 1352 (11th Cir. 1999) (quoting Gates, 103 S. Ct. at 2329). For this reason, "[c]ourts reviewing the legitimacy of search warrants should not interpret supporting affidavits in a hypertechnical manner; rather, a realistic and commonsense approach should be employed so as to encourage recourse to the warrant process and to promote the high level of deference traditionally given to magistrates in their probable cause determinations." United States v. Miller, 24 F.3d 1357, 1361 (11th Cir. 1994) (citing Gates, 103 S. Ct. at 2331-32; United States v. Ventresca, 85 S. Ct. 741, 746 (1965)); accord United States v. Hatcher, 300 Fed. Appx. 659, 663 (11th Cir. 2008) (same).  In reviewing the issuance of the federal search warrant, the undersigned must determine only that Magistrate Judge Baverman had a "substantial basis" for concluding that probable cause existed to uphold the warrant.  See Gates, 103 S. Ct. at 2331; see also Massachusetts v. Upton, 104 S. Ct. 2085, 2085 (1984) (per

20

curiam).   The validity of the warrant is considered based on the totality of the circumstances.  See Brundidge, 170 F.3d at 1352.

In addition to the information about observing the handgun in the residence and Defendant's statements, the federal affidavit included information regarding Defendant's two marijuana sales to the CS on October 31, 2013, and November 5, 2013.[8]  [Federal Affidavit ¶¶ 4-6].  Agent Cunningham also provided information about Defendant's link to various criminal gangs through Block 125 Entertainment and "Raised in the Cleveland" Territory, including, that the Target Location "is in the heart of" that area and "is known for high narcotics sales activity" and "for providing protection for people" selling drugs.  [Id. ¶ 7].  Probable cause, however, to search for evidence related to the offense of assaulting a federal officer is provided by the agent's recounting of what occurred the morning of November 21, 2013, when USMS and SERFTF officers, along with officers assigned to the APD Gang Unit, attempted to execute the state arrest and search warrants at the Target Location.  Defendant Bates

---

[8]The court agrees that this information does not provide the details, as discussed *infra*, about the drug transactions included in the affidavit for the state search warrant and arguably, if standing alone, might be insufficient to support a search of the residence for evidence of drug activity.  However, the federal search warrant is only one of two warrants authorizing a search of the Target Location, and the veracity of the CS is immaterial to the facts offered in support of the authorization in the federal warrant to seize evidence, such as firearms, related to the assault on the federal officer.

21

"discharged a firearm after police announced their presence" and a USMS TFO "was injured by gunfire during the execution of the search and arrest warrants." [Id. ¶¶ 8-9]. Defendant then barricaded himself in the residence, and officers heard Defendant "drop the firearm in the basement of the residence." [Id. ¶ 9]. The residence was secured. [Id.]. Based on this information, Judge Baverman properly determined that there was a fair probability that contraband or evidence, including the firearm used by Defendant, of the crime of assault on a federal officer would be found in the Target Location. Jiminez, 224 F.3d at 1248.

### b.    State Search Warrant Probable Cause

Defendant contends that the state search warrant for the Target Location lacked probable cause because the affidavit provided insufficient facts to establish the CS's reliability and veracity.[9] The court disagrees. The same probable cause analysis, as set forth *supra*, applies to Defendant's attack on the state search warrant.

Off. Kettel provided sufficient information for the state magistrate judge to evaluate and to determine the reliability of the information provided by the CS. "If an

---

[9]Although Defendant does not challenge the inclusion in the state affidavit regarding the CS observing a Glock pistol with an extended magazine and that Defendant advised that he had an assault rifle [State Affidavit ¶ 4], the court will not consider those statements in determining whether the state magistrate judge properly found probable cause to search the Target Location.

informant is mentioned in the affidavit, the affidavit must demonstrate the informant's 'veracity' and 'basis of knowledge.'" United States v. Johnson, 444 Fed. Appx. 424, 425 (11th Cir. 2011) (quoting Gates, 103 S. Ct. at 2332). "However, '[w]hen there is sufficient independent corroboration of an informant's information, there is no need to establish the veracity of the informant.'" Id. (quoting United States v. Martin, 297 F.3d 1308, 1314 (11th Cir. 2002)). Although Off. Kettel provides no background information about the CS and does not discuss whether the CS has cooperated in other cases resulting in drug seizures or arrests and convictions, the CS's reliability is corroborated by the two controlled buys made shortly before the state search warrant was obtained and executed. See, e.g., United States v. Hodges, 616 Fed. Appx. 961, 964-65 (11th Cir. 2015) ("The circumstances of the two controlled purchases of marijuana provided sufficient independent corroboration of the CI's account such that there was no need to establish his veracity."); United States v. Hawkins, 278 Fed. Appx. 629, 634-35 (6th Cir. 2008) (although the affidavit did not contain information about the CI's reliability, the necessary independent police corroboration of the CI's veracity is provided by controlled buy of drugs); United States v. Bramlett, 232 Fed. Appx. 940, 943 (11th Cir. 2007) ("without the statements in the affidavit regarding the CI's past reliability, there was a monitored controlled buy and 'sufficient independent

23

corroboration of [the] informant's information,' and, thus, no need to prove the CI's reliability") (citation omitted); <u>United States v. Thomas</u>, 159 Fed. Appx. 979, 982 (11th Cir. 2006) ("the informant's statements were corroborated by two controlled purchases from the apartment that yielded cocaine and ecstasy"); <u>United States v. Wilkerson</u>, 2010 WL 4624046, at *3 (M.D. Ala. August 18, 2010) ("Most important, officers were able to corroborate the sources' information immediately prior to executing the search warrant by making a controlled purchase from defendant."); <u>United States v. Graham</u>, 2006 WL 890661, at *4 (M.D. Fla. April 6, 2006) ("contrary to Defendant's argument, there was no need to establish the CI's veracity in the affidavit because the controlled buy was an independent corroboration of the CI's credibility").

In the affidavit for the state search warrant, Off. Kettel provided details about each controlled buy of marijuana-both being recorded and monitored by the officers-providing independent corroboration of Defendant's drug trafficking activities at the Target Location. Before the October 2013 transaction, the CS was searched for contraband and weapons and was then driven to the location by an undercover police officer, who watched the CS until he entered the Target Location. The CS spoke to "tight," later identified as Titus Bates, confirming the amount of the marijuana and price; then the CS purchased 1.025 ounces of marijuana from Bates for $300, using

24

official funds, as the officers listened to the transaction taking place and to the CS and Bates discussing future transactions.  After completing the transaction, the CS was searched and the quantity of marijuana was seized and field tested positive for marijuana.  The officers observed a Ford Taurus parked in the driveway of the Target Location which, when checked, was registered to Titus Bates further corroborating the CS's information.  The CS also identified Bates' driver's license photograph as the person who sold the marijuana.  [State Affidavit ¶ 4].

And Off. Kettel recounted that the CS was searched, before a second controlled purchase between November 5, 2013, and November 7, 2013, at the Target Location for contraband and extra funds - none being found.  The CS was provided with $170 in official funds (based on the discussions he had with Bates before the transaction), was driven by the undercover officer to the location and met with Bates in the location. While the officers monitored the transaction, the CS purchased 2.18 ounces of marijuana and then exited the location to be immediately driven away by the undercover officer.  The marijuana and $20 was seized from the CS and field tested positive for marijuana.  [Id. ¶ 5].

The issuing judge reasonably relied on the information provided in the affidavit, including that provided by the CS which was corroborated by the controlled buys and

independent investigation about Defendant Bates and the operation of various gangs associated with Defendant and operating in the Target Location's neighborhood [Id. ¶¶ 5-6], to determine that there was a fair probability that evidence of drug and gang activity would be found in the Target Location.[10]  See Jiminez, 224 F.3d at 1248.

### c.   Good Faith

Finally, as the Government correctly argues, even if the affidavits for the state and federal search warrants did not establish probable cause, the evidence seized from Defendant's residence should not be suppressed because the good faith exception to the exclusionary rule should be applied in this case.  [Doc. 143 at 11-13].  In United States v. Leon, 104 S. Ct. 3405 (1984), and Massachusetts v. Sheppard, 104 S. Ct.

---

[10]Even omitting the CS's statement about observing the Glock pistol in the Target Location and Defendant's statement about having an assault rifle, in light of the affiant's training and experience, there was probable cause to seize firearms and other weapons used to protect and/or guard Defendant's drugs or the proceeds of drug sales. See, e.g., United States v. Prather, 279 Fed. Appx. 761, 766 (11th Cir. 2008) ("When law enforcement officers stumble across hidden guns during a lawful search for drugs, they are allowed to draw the reasonable inference that the guns may be related to drug trafficking occurring at the location."); United States v. Smith, 918 F.2d 1501, 1509 (11th Cir. 1990) (firearms are "'tools of the trade'") (citation omitted); United States v. Acosta, 807 F. Supp. 2d 1154, 1261 (N.D. Ga. 2011) ("Due to the fact that firearms are tools of the drug trade, the firearms were properly seized as evidence in plain view."); United States v. Brown, 551 F. Supp. 2d 947, 950 (D. Ariz. 2008) (listing numerous cases recognizing "'the close relationship between drugs and firearms in the narcotics trade'") (citations omitted).

3424 (1984), the Supreme Court established a good faith exception to the exclusionary rule where officers placed reasonably objective reliance on a search warrant later determined to be defective.  In <u>United States v. Accardo</u>, 749 F.2d 1477 (11th Cir. 1985), the Eleventh Circuit Court of Appeals discussed the good faith exception established by the Supreme Court.  With the exception of cases "where the issuing magistrate wholly abandoned his judicial role[,]" or where "a warrant [is] based on an affidavit 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable[,]'" or where "a warrant may be so facially deficient – i.e., in failing to particularize the place to be searched or the things to be seized – that the executing officers cannot reasonably presume it to be valid[,]" the good faith exception applies.  <u>Id.</u> at 1480 & n.4 (citations omitted).  The good faith exception "require[s] suppression 'only if the officers were dishonest or reckless in preparing their affidavit or could not have harbored an objectively reasonable belief in the existence of probable cause.'"  <u>Id.</u> at 1480 (quoting <u>Leon</u>, 104 S. Ct. at 3422).  In making this decision, the totality of the circumstances surrounding issuance of the search warrant may be considered.  <u>Id.</u> at 1481.

Defendant contends that the good faith exception is not applicable because the federal affidavit includes the previously discussed allegedly false information and that

27

the exception is not applicable to either warrant because both affidavits are facially deficient with respect to probable cause making the officers' and agents' reliance on the warrants unreasonable.  [Doc. 92 at 5; Doc. 142 at 5].  The court has already determined that Defendant failed to present sufficient evidence to make a preliminary finding that Agent Cunningham either deliberately or with a reckless disregard for the truth included false, material information in the affidavit for the federal search warrant. This objection to application of the good faith exception is not persuasive.

And the search warrants for Defendant's residence were not "based on . . . affidavit[s] 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable[.]'" Leon, 104 S. Ct. at 3421 (citation omitted).  The court notes that the affidavits supporting the search warrant were not "'bare-bone' statement[s] of nothing more than conclusory allegations" which the Supreme Court in Leon found indicative of warrants falling within the third exception to the good faith doctrine.  See United States v. Glinton, 154 F.3d 1245, 1257 (11th Cir. 1998).  The affidavits included details about each affiant's training and experience, about information related from a confidential source - which, in the state affidavit, was substantiated by the observations of the officers and controlled buys - and about surveillance conducted surrounding Defendant's illegal drug distribution and gang

28

involvement.  Additionally, the federal affidavit provided a detailed accounting of Defendant's actions on the morning of November 21, 2013.  The affidavits presented much more than conclusory, "bare-bone" assertions for consideration by each magistrate judge.  The affidavits provided factual details for the magistrate judges to consider and evaluate.  The local and federal law enforcement officers were, therefore, entitled to rely upon the issuing judges' evaluations and determinations that "given all the circumstances set forth in the affidavit[s] before [them], there [was] a fair probability that contraband or evidence of a crime [would] be found in" the Target Location.  Gates, 103 S. Ct. at 2332.  Accordingly, the evidence seized from the residence is admissible at trial.

## IV.   Conclusion

For the foregoing reasons and cited authority, the court **RECOMMENDS** that Defendant's motion [Doc. 92] to suppress evidence be **DENIED**.

### Motion to Dismiss Count Two of the Superseding Indictment

In Count Two of the Superseding Indictment, the Government alleges that Defendant violated 18 U.S.C. § 924(c)(1)(A)(iii) by knowingly using, carrying and discharging a firearm during and in relation to a crime of violence, that is, an assault on a federal officer as described in Count One in violation of 18 U.S.C. § 111.  [Doc.

29

104 (Superseding Indictment"), Count Two].[11]   Defendant seeks dismissal of Count

Two of the Superseding Indictment, arguing that the predicate offense—assault on a

federal officer under 18 U.S.C. § 111—is not a "crime of violence," as that phrase is

defined in § 924(c)(3).  [Doc. 90].  For an offense to qualify as a "crime of violence"

under § 924(c), the conviction must fall under either § 924(c)'s "force clause" (§

924(c)(3)(A)) or its "residual clause" (§ 924(c)(3)(B)).[12]  Defendant contends that a

violation of the statute set forth in Count One, 18 U.S.C. § 111, cannot, as a matter of

law, satisfy the "force clause."   And he contends that the "residual clause" is

unconstitutional based on the Supreme Court's ruling in Johnson v. United States, 135

---

[11]Count One specifically alleges that "knowingly and by means of a dangerous weapon, that is, a firearm, [Defendant] did forcibly assault, resist, oppose, impede, intimidate, and interfere with a USMS Task Force Officer . . . while he [was] engaged in and on account of the performance of his official duties, and in so doing, did inflict bodily injury upon the USMS Task Force Officer . . . ."  [Superseding Indictment, Count One].

[12]The "force clause" provides that the term "crime of violence" means an offense that is a felony and "has as an element the use, attempted use, or threatened use of physical force against the person or property of another."  18 U.S.C. § 924(c)(3)(A). The "residual clause" provides that the term "crime of violence" also means an offense that is a felony and "that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense."  18 U.S.C. § 924(c)(3)(B).

30

S. Ct. 2551 (2015).  [Id.].  Thus, according to Defendant, Count Two, which is based on the predicate offense stated in Count One, must be dismissed.

With respect to the "force clause," Defendant argues that the predicate offense must have an element of "physical force."  Defendant points out that the Supreme Court has defined the term "physical force" as "'violent force,' that is, force which is 'capable of causing physical pain or injury to another person.'" [Doc. 90 at 3 (quoting Johnson v. United States, 130 S. Ct. 1265, 1271 (2010))].  And citing to the Supreme Court decision Descamps v. United States, 133 S. Ct. 2276 (2013), addressing sentencing enhancements, Defendant argues that the determination of whether a predicate offense qualifies as a "crime of violence" under § 924(c) should be resolved using the "'categorical approach'" which requires that a court "'look only to the statutory definitions-i.e., the elements—of a defendant's [offense] and not to the particular facts underlying [the offense] . . . .'" [Doc. 90 at 2 (quoting Descamps, 133 S. Ct. at 2283)].  Defendant argues that the predicate offense charged in the instant Superseding Indictment does not qualify as a "crime of violence" because it can be accomplished  without using or attempting or threatening the use of violent force and without proof of any physical contact at all.  [Id. at 3].

31

In response, the Government agrees that the categorical approach is "traditionally" employed to determine whether an offense constitutes a crime of violence under § 924(c), meaning that courts examine only "'the elements of the offense' and not 'the specific conduct of this particular offender.'" [Doc. 145 at 2-3 (quoting United States v. Chitwood, 676 F.3d 971, 977 (11th Cir. 2012))]. The Government then argues that the offense charged in Count One, specifically charging Defendant with using a dangerous weapon, a firearm, and inflicting bodily injury, by its very nature "'has as an element the use, attempted use, or threatened use of physical force against the person or property of another.'" [Id. at 3-4 (quoting 18 U.S.C. § 924(c)(3)(A) (the "force clause"))]. Relying on the decision in United States v. Bell, 158 F. Supp. 3d 906 (N.D. Ca. 2016), finding that the aggravated felony provision of § 111 - which is also charged in this case - constitutes a crime of violence under § 924(c)(3)(A), the Government argues that Defendant's motion to dismiss should be denied.[13] [Doc. 145 at 4-5].

---

[13]The Government then addressed the numerous cases finding that Hobbs Act robberies, charged in violation of 18 U.S.C. § 1951, constitute crimes of violence supporting a charge pursuant to § 924(c)(3)(A) and argued that the same is true for § 111(b) charges. [Doc. 145 at 6-8]. However, the court finds that it is not necessary to address the applicability of the Hobbs Act line of cases to the issue before this court.

In reply, Defendant focuses on the Government's contention that, because the § 111 charge as indicted included the use of a dangerous weapon and inflicting bodily injury, his conduct satisfied the level of force required under § 924(c) and by Johnson. Defendant disputes that conclusion arguing that simply because he used a deadly weapon does not establish a crime of violence.  [Doc. 150 at 1-2 (citing, *inter alia*, United States v. Rafidi, 829 F.3d 437, 446 (6th Cir. 2016))].  And Defendant, trying to link the crime charged in the Superseding Indictment to a "simple assault," argues that the provision charged does not require proof of his intent to inflict an injury whether or not the federal officer was actually injured in this case.  [Id. at 3].

After consideration of the arguments and binding and persuasive legal authority, the court finds that the charge in Count One is a crime of violence triggering the "force clause" in § 924(c) and that Defendant's motion to dismiss should be denied.

## I.    Discussion

Count One of the Superseding Indictment charges that Defendant "knowingly and by means of a dangerous weapon, that is, a firearm, did forcibly assault, resist, oppose, impede, intimidate, and interfere with a USMS Task Force Officer . . . while he [was] engaged in and on account of the performance of his official duties, and in so doing, did inflict bodily injury upon the USMS Task Force Officer, [in] violation of

33

Title 18, United States Code, Section[ ] 111." [Superseding Indictment, Count One].

Section 111 provides in pertinent part:

> (a) In general.-Whoever-
>
> (1) forcibly assaults, resists, opposes, impedes, intimidates, or interferes with any person designated [as a federal officer] while engaged in or on account of the performance of official duties . . .
>
> shall, where the acts in violation of this section constitute only simple assault, be fined under this title or imprisoned not more than one year, or both, and where such acts involve physical contact with the victim of that assault or the intent to commit another felony, be fined under this title or imprisoned not more than 8 years, or both.
>
> (b) Enhanced penalty.-Whoever, in the commission of any acts described in subsection (a), uses a deadly or dangerous weapon . . . or inflicts bodily injury, shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. § 111.  Looking to the language set forth in the charging document, Defendant Bates is charged under the enhanced penalty provision § 111(b). [Superseding Indictment, Count One].

The court may consider the Superseding Indictment in determining whether Count One is a crime of violence because, although a "'categorical approach'" is used "to determine whether an offense constitutes a 'crime of violence' for purposes of § 924(c)" - focusing "on the statutory definition of the offense, rather than the manner

34

in which an offender may have violated the statute in a particular instance[,]" the

"'modified categorical approach'" applies in this case.[14]  <u>Rafidi</u>, 829 F.3d at 444

(citations omitted).  The "modified categorical approach" applies when the statute

under consideration is "divisible," that is, "sets out one or more elements of the offense

in the alternative." <u>Id.</u> (citation and internal quotation marks omitted).  Accordingly,

"'[i]f [the underlying] statute could be violated in a way that would constitute a crime

of violence and in a way that would not, [the court] look[s] beyond the statutory

language and examine[s]' a limited set of documents 'to determine whether the

_____

[14]There is some question whether, when considering a pretrial motion to dismiss, it is appropriate for the court to use the categorical approach and evaluate, before trial, whether a charged offense constitutes a crime of violence.  A number of district courts, including in the Northern District of Georgia, have denied motions to dismiss on the grounds asserted by Defendant Bates finding that the trial jury should determine whether the charge, such as 18 U.S.C. § 111(b), is a crime of violence and constitutes a predicate offense under the "force clause" of § 924(c).  <u>See, e.g.</u>, <u>United States v. Lobo-Lopez</u>, 206 F. Supp. 3d 1084, 1096 n.24 (E.D. Va. 2016) (listing cases); <u>United States v. Rook</u>, 2016 WL 8710421, at **4-5 (N.D. Ga. March 25, 2016), <u>report and recommendation adopted by</u> 2016 WL 2344877 (N.D. Ga. May 3, 2016) (citing, <i>inter alia</i>, <u>United States v. Collins</u>, 2016 WL 1639960, at **28-29 (N.D. Ga. February 9, 2016), <u>report and recommendation adopted by</u>, 2016 WL1623910 (N.D. Ga. April 25, 2016)); <u>United States v. Morgan</u>, 2015 WL 9463975, at **2-5 (E.D. Mich. December 18, 2015).  However, because both Defendant and the Government urged application of the categorical approach and due to uncertainty whether the Eleventh Circuit Court of Appeals' use of the categorical approach in <u>United States v. McGuire</u>, 706 F.3d 1333, 1336-37 (11th Cir. 2013), would extend to a pretrial motion to dismiss, <u>see</u> <u>Rook</u>, 2016 WL 8710421, at *5, the court will not recommend denial of the motion to dismiss on this ground.

conviction necessarily depended on the commission of a crime of violence.'"  Id. (citation omitted); and see United States v. Taylor, 848 F.3d 476, 491-92 (1st Cir. 2017) (same).  Section 111 is a divisible statute setting forth "three separate crimes whose elements must all be submitted to a jury. . . . Two crimes are established in § 111(a): a misdemeanor (cases involving only simple assault) and a felony (all other cases. . . .  The third crime-an aggravated felony-is committed by violating § 111(b), which prohibits violations of § 111 that either involve a deadly or dangerous weapon or result in bodily injury."  Rafidi, 829 F.3d at 445 (citations and internal quotation marks omitted); and see Taylor, 848 F.3d at 492 (same).  Under these circumstances, among other documents relevant in the post-conviction stage of criminal proceedings, a court may consider the language of the indictment.  Taylor, 848 F.3d at 492.

As stated by the court in Taylor, "In assessing whether the enhanced versions of § 111(b) are crimes of violence, [the court does] not write on a clean slate.  In fact, every court [this court is] aware of that has considered the issue has found that it is because the elements of the enhanced offense require the use, attempted use, or threatened use of force capable of causing pain or injury."  848 F.3d at 492-93 (citing Rafidi, 829 F.3d at 445-46; United States v. Hernandez-Hernandez, 817 F.3d 207, 215 (5th Cir. 2016); United States v. Green, 543 Fed. Appx. 266, 272 (3rd Cir. 2013); United

36

States v. Juvenile Female, 566 F.3d 943, 948 (9th Cir. 2009)); and see United States v. Wing, 2016 WL 6803695, at *6 (D. Colo. November 17, 2016) (joining other courts "in concluding that conviction under § 111(b) includes as an element the 'use, attempted use, or threatened use of physical force'") (listing cases).  This court agrees with the reasoning of these cases as set forth *infra*.

Courts considering this issue have noted that the question is not whether § 111(a) triggers the "force clause" of § 924(c) but whether § 111(b) "'has as an element the use, attempted use, or threatened use of physical force against the person or property of another.'"  Rafidi, 829 F.3d at 445 (quoting 18 U.S.C. § 924(c)(3)(A)) ("the government must establish a violation of § 111(a) in addition to the use of a deadly or dangerous weapon or the 'inflict[ion] [of] bodily injury'") (citation omitted); Taylor, 848 F.3d at 493 ("We need not dwell on § 111(a).").[15]  As stated by the court in Rafidi, a court "must determine whether § 111(b) has as an element the use or attempted use of '*violent* force-that is, force capable of causing physical pain or injury to another.'"  829 F.3d at 445 (quoting Johnson, 130 S. Ct. at 1271) (emphasis in

---

[15]For this reason, Defendant's arguments focusing on the elements of § 111(a) and whether a "simple assault" triggers application of the "force clause" are not relevant to the court's discussion of whether § 111(b)'s elements do so.  [Doc. 90; Doc. 150 at 2-3].

original).  Holding that the statute does establish that element, the Rafidi court found significant that "a defendant must act 'forcibly' to violate § 111," which "'may be satisfied by proof of actual physical contact.'"  Id. (citations omitted); and see Taylor, 848 F.3d at 493 (same).  Although, under § 111(a), such contact may not involve violent force, the court stated that "a violation of § 111(b) involving a deadly weapon is meaningfully different than a violation of § 111(a), by itself."  Rafidi, 829 F.3d at 445 (emphasis in original).  As the court explained,

> Not every crime becomes a crime of violence when committed with a deadly weapon.[16]  But if a statute ha[s] as an element some degree of, or the threat of, physical force in the more general sense, then the use of a deadly weapon may transform this more general force into the necessary violent force to constitute a crime of violence with the meaning of Johnson I.[17] . . .  Under this reasoning, if a defendant commits a violation of § 111 through intentionally causing physical contact with the federal officer-even if this physical contact is not in itself capable of causing physical pain and injury, . . .-§ 111(b)'s additional required element of using a deadly weapon during this encounter would elevate this lower degree of physical force into violent force sufficient to establish § 111(b) as a crime of violence.

---

[16]The court notes that, in support of his argument that § 111(b) is not a crime of violence, although requiring use of a deadly or dangerous weapon, Defendant quoted this language [Doc. 150 at 2]; however, Defendant failed to provide the context of the Rafidi's court's discussion or that the court's following conclusion was contrary to Defendant's argument.

[17]That is Johnson v. United States, 130 S. Ct. 1265 (2010).

38

Rafidi, 829 F.3d 445-46 (citations and internal quotation marks omitted; emphasis in original); and see Taylor, 848 F.3d at 493-94 (noting that the "first enhanced version of § 111 is met when the defendant uses a deadly or dangerous weapon in assaulting the federal officer" and recalling "that to be a crime of violence, the crime must require the use, attempted use, or threatened use of force capable of causing physical pain or injury to another person[,]" the court held that a "defendant who acts forcibly using a deadly or dangerous weapon under § 111(b) must have used force by making physical contact with the federal employee, or at least threatened the employee, with an object that, as used, is capable of causing great bodily harm").

The court in Rafidi then discussed the second, "in the absence of physical contact, . . . element of force necessary for a conviction under [§ 111]" which "may be shown by such a threat or display of physical aggression toward the officer as to inspire fear of pain, bodily harm, or death." 829 F.3d at 446 (citation and internal quotation marks omitted). The court found, "[E]ven is the defendant did not come into physical contact with the officers at all, the government still must establish the forcible element, and a threat or display of physical aggression sufficient to inspire fear of pain, bodily harm, or death constitutes the threatened use of physical force within the meaning of Johnson I." Id. (citations and internal quotation marks omitted). And in

Taylor, the court held, "The second enhanced version of § 111 is met when the defendant inflicts bodily injury in the course of forcible assault. If 'a slap in the face' counts as violent force under Johnson because it is 'capable' of causing pain or injury, . . . a 'forcible' act that injures does, too, because the defendant 'necessarily must have committed an act of force in causing the injury.'" 848 F.3d at 494 (citations omitted).

The reasoning of the Rafidi and Taylor courts is persuasive. In this case, the Superseding Indictment alleges both enhanced penalty elements, that is, that Defendant forcibly assaulted the federal officer with a deadly weapon, a firearm, and, in so doing, inflicted a physical injury. [Superseding Indictment, Count One]. The elements of the § 111(b) crime pleaded in this case satisfy the definition of "crime of violence" for the purposes of § 924(c)(3) and triggers the applicability of § 924(c)(3)(A).

For these reasons, the court finds that § 111(b) "constitutes a 'crime of violence' within the meaning of § 924(c)(3)," Rafidi, 829 F.3d at 446, and that Defendant's motion to dismiss Count Two should be denied. Because the court has found that the "force clause" of § 924(c)(3)(A) applies in this case, the court will not address Defendant's alternative argument that the "residual clause" of § 924(c)(3)(B) is unconstitutional. However, although neither the Supreme Court nor the Eleventh Circuit Court of Appeals has resolved the issue, see United States v. Rosales-Acosta,

40

2017 WL 562439, at *3 (11th Cir. February 13, 2017), the court notes that all but one of the circuit court decisions found by the court have declined to extend the holding in Johnson, 135 S. Ct. 2551, to 18 U.S.C. § 924(c)'s "residual clause" and have declined to find that § 924(c)(3)(B) is unconstitutionally vague.  See, e.g., United States v. Davis, __ Fed. Appx. __, __, 2017 WL 436037, at *2 (5th Cir. January 31, 2017); United States v. Hill, 832 F.3d 135, 145-50 (2nd Cir. 2016); United States v. Taylor, 814 F.3d 340, 375-76 (6th Cir. 2016); United States v. Prickett, 839 F.3d 697, 700 (8th Cir. 2016); but see United States v. Cardena, 842 F.3d 959, 995-96 (7th Cir. 2016).  Additionally, a number of judges in the Northern District of Georgia have declined to extend Johnson, thereby, declining to hold § 924(c)(3)(B), the "residual clause," unconstitutional.  See, e.g., Fairnot-Woods v. United States, 2016 WL 7192144, at *3 (N.D. Ga. November 7, 2016), report and recommendation adopted by United States v. Fairnot-Woods, 2016 WL 7188174 (N.D. Ga. December 12, 2016); Kim v. United States, 2016 WL 5438449, at *2 (N.D. Ga. September 29, 2016); Jones v. United States, Case No. 4:12-CR-9-HLM, Doc. 320 (N.D. Ga. September 28, 2016); and see Morton v. United States, 2017 WL 1041568, at **2-6 (S.D. Fla. March 2, 2017); Lobo-Lopez, 206 F. Supp. 3d at 1095-96; Morgan, 2015 WL 9463975, at **7-8.

41

## II.     Conclusion

For the foregoing reasons and cited authority, the court **RECOMMENDS** that Defendant's motion [Doc. 90] to dismiss Count Two of the Superseding Indictment be **DENIED**.

### **Motion to Dismiss Count Four of the Superseding Indictment**

Defendant also moves to dismiss Count Four of the Superseding Indictment alleging vindictive prosecution. [Doc. 112]. Defendant contends that the Government sought a superseding indictment adding a count charging Defendant with using, carrying and discharging a firearm in the commission of a drug trafficking offense [Superseding Indictment, Count Four], which could have been brought in the original indictment and which seriously enhances his potential punishment if convicted, in response to Defendant's withdrawal of his guilty plea, refusal to negotiate a new plea of guilty and assertion of his right to a jury trial. [Doc. 112, 147]. The Government responds that there is no presumption of vindictiveness under the circumstances relied on by Defendant in the pretrial setting and that the allegations set forth by Defendant do not establish actual vindictiveness. [Doc. 144]. The court agrees with the Government.

42

## I.     Procedural History

On December 17, 2013, Defendant was indicted for violations of 18 U.S.C. § 111, using a firearm to forcibly assault, resist, oppose, impede, intimidate and interfere with a federal task force officer; of 18 U.S.C. § 924(c)(1)(A)(iii), using a firearm during and in relation to a crime of violence, the charge in Count One; of 21 U.S.C. § 841, possessing with intent to distribute a quantity of marijuana; and of 18 U.S.C. § 922(g), being a convicted felon in possession of a firearm.  [Doc. 2 ("Indictment"), Counts One - Four].  Although Defendant initially filed pretrial motions [Docs. 24 and 25], after new counsel appeared on behalf of Defendant, the motions were withdrawn and the case was certified ready for trial on February 4, 2014, with Defendant intending to enter a plea of guilty.  [Docs. 30, 31 and 32; Docket Entry dated September 4, 2014].  The change of plea hearing was rescheduled and then postponed due the issue of Defendant's competency to stand trial, and the case was decertified for proceedings before the undersigned.  [Docket Entry dated September 11, 2014, and October 3, 2014; Docs. 41 and 45].

A report and recommendation that Defendant was competent to stand trial and an order certifying the case ready for trial, again, was entered on March 13, 2015.  The District Court adopted the recommendation finding Defendant competent, and a trial

43

date of June 8, 2015, was set.  [Docs. 47 and 50; Docket Entry dated April 22, 2015].

The trial date was continued on several occasions until Defendant decided, again, to

enter a plea of guilty. [Docs 55, 59 and 61].  On July 30, 2015, Defendant entered a

plea of guilty to Counts One and Two of the indictment, and sentencing was set for

October 13, 2015.  [Docs. 62 and 63].  Thereafter, Defendant sought new counsel,

which was referred to the undersigned, and after a hearing, the court reappointed the

Federal Public Defender to represent Defendant.  [Docs. 67 and 68].  The District

Court reset Defendant's sentencing for December 2, 2015.  [Docket Entry dated

September 23, 2015].

However, on November 20, 2015, Defendant moved to withdraw his guilty plea

which was opposed by the Government.  [Docs. 73 and 76].  After hearing from the

parties, on February 25, 2016, the District Court granted the motion allowing

Defendant to withdraw his guilty plea and reset the trial for May 9, 2016.  [Docs. 79,

81 and 82].  On March 3, 2016, Defendant filed a motion to decertify the case and to

allow the filing of pretrial motions.  [Doc. 84].  The Government did not oppose the

motion [Doc. 85], which was granted by the District Court - sending the case back to

the undersigned on March 14, 2016 [Doc. 86].  On April 18, 2016, Defendant filed

several motions, including the motion to dismiss Count Two, the § 924(c) charge

44

brought in connection with the assault on a federal officer [Doc. 90], and the motion to suppress evidence resulting from Defendant's arrest and execution of the state and federal search warrants [Doc. 92]. A pretrial conference was held on June 2, 2016, setting an evidentiary hearing on the now withdrawn motion to suppress identification testimony. [Docket Entry dated June 2, 2016; Doc. 136].

On July 12, 2016, the Government obtained the Superseding Indictment against Defendant which contained the four counts set forth in the original Indictment, with the felon in possession of a firearm charge, originally set forth in Count Four recharged in Count Five. [Superseding Indictment, Counts One - Three and Five]. The Superseding Indictment included a new Count Four alleging using and carrying a firearm in connection with the drug distribution charge contained in Count Three, in violation of 18 U.S.C. § 924(c)(1)(A)(iii). [Id., Count Four]. Subsequently, Defendant filed the motions to dismiss for vindictive prosecution currently under consideration and a motion to dismiss Counts Two and Four. [Docs. 112 and 114].

Additional facts will be set forth as necessary during discussion of the motion to dismiss Count Four.

45

## II.    Discussion

As noted, Defendant contends that, based on the timing of and sequence of events in this case, the Government sought the Superseding Indictment in retaliation for Defendant withdrawing his guilty plea and declining to further negotiate a guilty plea. [Docs. 112 and 147].  Defendant asserts that his Fifth Amendment due process rights were violated by the Government's action in adding a new charge of violation of 18 U.S.C. § 924(c), which could have been brought in the original indictment and which enhances his potential punishment.  [Id.].  The Government responds that there is no presumption of vindictiveness under the circumstances of this case and that Defendant has failed to demonstrate actual vindictiveness.  [Doc. 144].  Both parties rely on the decision of the Eleventh Circuit Court of Appeals in United States v. Barner, 441 F.3d 1310 (11th Cir. 2006), which interprets and applies the prior decisions of the Supreme Court on the issue of vindictive prosecution; however, Defendant's reliance on Barner is misplaced given the facts before this court.

In Barner, the court began by providing a summary of the law relevant to the issue before this court.  The court stated,

> A prosecutor may seek a superseding indictment at any time prior to a trial on the merits, . . . so long as the purpose is not to harass the defendant . . . .  As a general rule, as long as the prosecutor has probable

46

cause to believe the accused has committed a crime, the courts have no authority to interfere with a prosecutor's decision to prosecute. . . . However, a superseding indictment adding new charges that increase the potential penalty would violate due process if the prosecutor obtained the new charges out of vindictiveness. . . .  Vindictiveness in this context means the desire to punish a person for exercising his rights.

441 F.3d at 1315 (citations and internal quotation marks omitted).  The court further

noted that the Supreme Court has held that "[a] prosecutor's decision to seek

heightened charges after a defendant successfully appeals his conviction for the same

conduct is presumed to be vindictive."  Id. at 1315-16 (citing Blackledge v. Perry, 94

S. Ct. 2098 (1974)).  However, while such a decision post-trial is sufficient to invoke

a presumption, "proof of a prosecutorial decision to increase charges after a defendant

has exercised a legal right does not alone give rise to a presumption in the *pretrial*

context."  Id. at 1316 (citation and internal quotation marks omitted; emphasis in

original).

The Barner court cited two Supreme Court decisions following Blackledge

illustrating that conclusion.  The Eleventh Circuit Court of Appeals stated that in

Bordenkircher v. Hayes, 98 S. Ct. 663 (1978), a prosecutor threatened the defendant

with "an additional charge if the defendant did not plead guilty to the existing charge;

the defendant did not so plead, and the prosecutor obtained a superseding indictment

47

with the new charge." Barner 441 F.3d at 1316.  In the plea bargaining context presented in that case, "the Supreme Court held there was no 'punishment or retaliation' and hence no vindictiveness or due process violation in plea bargaining 'so long as the accused [was] free to accept or reject the prosecution's offer.'" Id. (citing Bordenkircher, 98 S. Ct. at 668).  The Barner court summarized the Supreme Court holding, "Thus, the Court distinguished between the impermissible attempt to punish an already-accomplished exercise of appeal rights in Blackledge and the permissible attempt to persuade the defendant not to exercise his trial right in the future in Bordenkircher." Id.

Shortly thereafter, the Supreme Court addressed this issue again in United States v. Goodwin, 102 S. Ct. 2485 (1982).  As summarized by the Eleventh Circuit Court of Appeals, in Goodwin, "the defendant had already exercised his rights to decline to plead guilty to the misdemeanor charge against him and to request a jury trial when the prosecutor had him indicted on a felony charge, for which he was ultimately convicted." Barner, 441 F.3d at 1316 (citing Goodwin, 102 S. Ct. at 2487).  The Supreme Court rejected the defendant's contention that he was being punished for exercising his right to a jury trial. Id.  The court in Barner found that "Goodwin does . . . distinguish between pre- and post-trial exercise of rights, reasoning that aspects of

48

the pre-trial situation make vindictiveness less likely and therefore militate against use of a presumption of vindictiveness." Id. at 1317. However, the court noted that "nothing in the language or rationale of Goodwin rules out the possibility that a case could present additional factors that would make it appropriate to use the presumption in a pre-trial setting." Id. While other courts have interpreted Goodwin "as simply directing the courts to evaluate the 'realistic likelihood of vindictiveness' in a particular factual situation, including a pre-trial situation, and to determine whether any facts make a presumption of vindictiveness proper[;]" the Eleventh Circuit Court of Appeals has not adopted that approach. Id. at 1317-18. Furthermore, as was the case in Barner, even if "compelling facts could justify a presumption in a pre-trial setting," this court finds that the facts presented by Defendant Bates do not "form a realistic likelihood of vindictiveness." Id. at 1318.

Defendant relies on the facts that he withdrew his guilty plea and that the new charge, enhancing the potential sentence he faced, followed closely in time to his rejection of further plea negotiations which triggers a finding of "a realistic likelihood of vindictiveness." Id. On the record before this court these factors do not support Defendant's argument. In Barner, the defendant likewise pointed to the fact that he had withdrawn his guilty plea "as an exercise of rights that preceded the new charges"

49

in that case. Id. at 1319. The court noted that the withdrawal of the plea occurred more than a year before return of the superseding indictment and found that nothing in the record established a causal relationship between the two events.[18] Id. Likewise, in this case, Defendant moved to withdraw his guilty plea on November 20, 2015 [Doc. 73], and, although opposed by the Government [Doc. 76], once the District Court granted the motion on February 25, 2016 [Doc. 81], the Government did *not* oppose Defendant's request to decertify the case and to file new pretrial motions - hardly the action of a vindictive prosecutor. [Docs. 84 and 85]. The Superseding Indictment was not returned until almost five months later. [Doc. 104]. Nothing in this record provides a casual connection between withdrawal of the plea and the Superseding Indictment or presents the likelihood of vindictiveness by the Government in seeking the Superseding Indictment. See also United States v. South, 295 Fed. Appx. 959, 962-63, 967-68 (11th Cir. 2008) (the defendant contended that the withdrawal of his guilty plea at sentencing, followed by a superseding indictment bringing additional charges - subjecting him to a mandatory life sentence - established vindictive

---

[18]Even assuming a relationship between the events, citing Bordenkircher, the Barner court pointed out that the Supreme Court found no due process violation when the prosecutor obtained additional charges because of the defendant's refusal to plead guilty. Id. at 1319 (citing Bordenkircher, 98 S. Ct. at 669).

50

prosecution; however, the court rejected the defendant's argument and held, because there is no presumption of vindictiveness in the pretrial situation before the court, that the defendant had to show actual vindictiveness but could not due to the fact the prosecutor had probable cause to bring the new charges).

And, even assuming that Defendant could establish that the Superseding Indictment followed close in time to the break-down of plea negotiations in June 2016, that fact simply is insufficient to present the likelihood of vindictiveness.  As the court in Barner noted, "in Bordenkircher, the prosecutor explicitly obtained a new indictment because the defendant refused to plead guilty, and the Supreme Court held that this did not violate due process."  441 F.3d at 1319 (citing Bordenkircher, 98 S. Ct. at 669); and see United States v. Castronuovo, 2013 WL 2329964, at **3-4 (S.D. Fla. May 28, 2013) (rejecting the defendant's contention that a presumption of vindictiveness (or actual vindictiveness) is raised by the prosecutor obtaining a superseding indictment "that dramatically increased the possible penalties he faced" only after he "refused to plead guilty and had stated his intention to move for a severance," the court found that it could not "bring itself to make the . . . leap in logic" argued by the defendant, that is, that the new charges "were brought to punish him for exercising his constitutional rights"); United States v. Lamons, 2006 WL 1341303, at

51

**4-5 (N.D. Ga. May 15, 2006) (the court rejected the defendant's argument, assuming the evidence established a rejection of a plea offer preceded the superseding indictment (returned a year after the original indictment relying on information previously in the government's possession), that he had established a presumption of vindictiveness and noted that plea bargaining involves "give and take," including a prosecutor advising a defendant that additional charges may follow rejection of a plea offer; such discussions and actions are not vindictive "as long as the prosecutor has probable cause to believe that the accused committed the count added by the subsequent superseding indictment and the accused has the choice to accept or reject the plea offer").

In this case, Defendant does not argue that the prosecutor lacked probable cause to bring the charge in Count Four of the Superseding Indictment.  The fact that Defendant may face more serious potential punishment having determined to go to trial is not uncommon in most prosecutions.  As the court in Barner stated, "[I]t is commonplace that a defendant can expect to get a more favorable sentence from a plea bargain than from proceeding to trial and losing; were it otherwise, few defendants would forego their right to a trial."  441 F.3d at 1320.

The court also notes that there may be reasons, other than vindictiveness, prompting the government's actions.  In Barner, the defendant relied in part on the fact

52

that the superseding indictment was returned after he had successfully obtained dismissal of multiplicitous counts in the original indictment.  The government, in fact, acknowledged a connection between the dismissal and the return of the superseding indictment in order "to recharge the conduct that formed the basis of the dismissed counts."  441 F.3d at 1319.  Citing the decision in United States v. Taylor, 749 F.2d 1511, 1514 (11th Cir. 1985), the Barner court found that "the government's attempt to correct its earlier mistake and charge the conduct in a way that could support a conviction does not show a desire to punish Barner for exercising his rights, but rather to punish him for the alleged felonious conduct."  441 F.3d at 1319, 1321 (rejecting the district court's reliance on a comparison of possible punishment before and after return of the superseding indictment, the appellate court stated that doing so "assumes the government had no right to recharge the conduct in a way that would survive a motion to dismiss; . . . it was not improper for the government to try to correct its earlier error").

In this case, although the court is not recommending dismissal of the § 924(c) charge in Count Two, brought in connection with the alleged assault on a federal officer in Count One, the court notes that the Superseding Indictment, charging a § 924(c) offense but in connection with the drug distribution charge in Count Three, was

53

brought after Defendant moved to dismiss Count Two. [Docs. 90 and 104]. It is just as likely, arguably more so given the record in this case, that the prosecutor brought the charge in Count Four to ensure, if Count Two was dismissed, that Defendant is "punish[ed] for the alleged felonious conduct" associated with using and firing the firearm and not for exercising his constitutional rights. Barner, 441 F.3d at 1319. Whether charging both § 924(c) counts based on the incidents occurring on November 21, 2013, subjects the charges to dismissal on other grounds will be determined next.

And, on these facts, Defendant cannot show actual vindictiveness. "To establish actual vindictiveness, a defendant must prove that: (1) the prosecutor wanted to punish the defendant for exercising his rights (animus); and (2) the prosecutor's animus caused the prosecutor to bring charges of increased severity (causation)." United States v. Mwangi, 2010 WL 690136, *17 (N.D. Ga. February 18, 2010). "A showing of actual vindictiveness is 'exceedingly difficult to make'" and is a burden borne by the defendant. Id. (citation omitted). Defendant has not made any showing, beyond the timing and sequence of events in this case and the potential for an increased sentence upon conviction, in an attempt to establish actual vindictiveness. [Docs. 112 and 147]. See Id., at **16-17 (rejecting the defendant's claim of actual vindictiveness for the same reasons he failed to establish a presumption of vindictiveness, including,

54

bringing charges of increased severity after the defendant obtained dismissal of the criminal complaint - "the government's conduct of indicting the defendant after dismissal of the criminal complaint reflects the government's attempt to correct a procedural defect, which does not raise the specter of vindictiveness"); Lamons, 2006 WL 1341303, at *5 (rejecting the defendant's reliance on the timing of the superseding indictment, adding a charge based on information in the government's possession when seeking the original indictment, to show actual prejudice).   In this case, Defendant Bates offered no proof that either prosecutor harbored any animus towards Defendant for withdrawal of his guilty plea or for refusal to accept a new plea offer. Similarly, there is no evidence that the new count was the result of a vindictive motive. In fact, as noted, the Government did not oppose the case being decertified to allow Defendant to file new pretrial motions and to, arguably, defend the charges at trial. [Docs. 84 and 85].  The record in this case simply does not support a finding of actual vindictiveness.

## III.    Conclusion

For these reasons, the court **RECOMMENDS** that Defendant's motion [Doc. 112] to dismiss Count Four of the Superseding Indictment be **DENIED**.

## **Motion to Dismiss Counts Two and Four of the Superseding Indictment**

Finally, Defendant moves to dismiss Counts Two and Four of the Superseding Indictment contending that the two charges brought pursuant to 18 U.S.C. § 924(c) are muliplicitous because both charges are based on Defendant's alleged single use, carry and discharge of a firearm on November 21, 2013.  [Doc. 114].  Defendant relies on the Sixth Circuit Court of Appeals' decision in United States v. Vichitvongsa, 819 F.3d 260 (6th Cir. 2016), in which the court found that for each § 924(c) conviction, "'the defendant must use, carry, or possess a firearm - even if it is the same one - more than once.'['"  [Id. at 3 (quoting Vichitvongsa, 819 F.3d at 269)].  In response, relying on the Eleventh Circuit Court of Appeals' decision in United States v. Rahim, 431 F.3d 753 (11th Cir. 2005), the Government argues that § 924(c) allows convictions for "two violations arising from predicate crimes in the same course of conduct . . . ." [Doc. 146 at 3-4 (citing Rahim, 431 F.3d at 756-57)].  The Government goes on the argue that cases in other circuits resolving this issue would support a conviction under the circumstances in this case and that those finding § 924(c) counts multiplicitous are distinguishable.  [Id. at 4-6].  In reply, Defendant, correctly, first argues that the facts upon which the decision in Rahim is based are distinguishable from the facts in this case and that the facts in the cases finding the § 924(c) counts multiplicitous, being

56

based on one use of a firearm, support Defendant's argument. [Doc. 148 at 1-2 (citing United States v. Finley, 245 F.3d 199 (2nd Cir. 2001); United States v. Wilson, 160 F.3d 732 (D.C. Cir. 1998)].  For the reasons stated herein, the court recommends that Defendant's motion to dismiss for multiplicity be denied at this stage of the proceedings because, in addition to the lack of guidance in the Eleventh Circuit, the remedy Defendant seeks, even if the counts are multiplicitous, is inappropriate.

## I.     Superseding Indictment

Counts Two and Four of the Superseding Indictment have been set forth previously; however, for ease of discussion, the court will do so again.  Count Two alleges that "[o]n or about November 21, 2013, . . . [Defendant] did knowingly use, carry, and discharge a firearm, . . . during and in relation to a crime of violence for which he may be prosecuted in a court of the United States, that is, Assault on a Federal Officer, as described in Count One above, in violation of [18 U.S.C. § 924(c)(1)(A)(iii)]."  [Superseding Indictment, Count One].  And Count Four alleges that "[o]n or about November 21, 2013, . . . [Defendant] did knowingly use, carry, and discharge a firearm, during and in relation to a drug trafficking crime for which he may be prosecuted in a court of the United States, that is, possession of marijuana with the intent to distribute, as described in Count Three above, in violation of [18 U.S.C. §

57

924(c)(1)(A)(iii)]." [Superseding Indictment, Count Four].  With the exception of the underlying predicate offenses charged, the conduct alleged in each count appears to be the same.

## II.    Discussion

"'An indictment is multiplicitous if it charges a single offense in more than one count.'"   United States v. Jones, 601 F.3d 1247, 1258 (11th Cir. 2010) (citation omitted).  There are two potential vices associated with a multiplicitous indictment: "'First, the defendant may receive multiple sentences for the same offense.  Second, a multiplicitous indictment may improperly prejudice a jury by suggesting that a defendant has committed several crimes–not one.'"  United States v. Smith, 231 F.3d 800, 815 (11th Cir. 2000) (quoting United States v. Langford, 946 F.2d 798, 802 (11th Cir. 1991)).  In order to determine whether the counts are multiplicitous, the court must analyze issues involving double jeopardy "under the test set forth by the Supreme Court in Blockburger v. United States, [52 S. Ct. 180] (1932)."  United States v. Carson, 447 Fed. Appx. 925, 926 (11th Cir. 2011).[19]  "'[T]he Blockburger test is one

--------

[19] "Although Blockburger addressed criminal offenses in separate statutory sections, this same test has been applied to several offenses enumerated in one statutory section." United States v. Santos-Gomez, 2012 WL 1939726, at *1 (N.D. Ga. May 29, 2012).

AO 72A
(Rev.8/82)

of statutory interpretation in which we examine the elements of each offense to determine whether Congress intended to authorize cumulative punishments.'" Id. (quoting United States v. Williams, 527 F.3d 1235, 1240 (11th Cir. 2008)).  In using that test, the court determines "'whether an indictment is multiplicitous [by] verifying that each count requires an element of proof that the other counts do not require.'" Jones, 601 F.3d at 1258 (citation omitted); see also Carson, 447 Fed. Appx. at 926 (the court determines "if each offense 'requires proof of an additional fact which the other does not'") (citation omitted).  The test is satisfied despite substantial overlap of the evidence introduced on separate offenses.  See United States v. Hassoun, 476 F.3d 1181, 1185 (11th Cir. 2007) ("'If each [count] requires proof of a fact that the other does not, the Blockburger test is satisfied, notwithstanding a substantial overlap in the proof offered to establish the crimes.'") (citation omitted); United States v. Boldin, 772 F.2d 719, 726 (11th Cir. 1985) ("Similarly, a substantial overlap in the proof offered to establish the crimes is not a double jeopardy bar.").

"Where the potentially multiplicitous violations are all charged under a single statute, the key question 'is whether the legislature authorized separate punishments for separate offenses.'"  Carson, 447 Fed. Appx. at 925 (quoting Ward v. United States, 694 F.2d 654, 661 n.13 (11th Cir. 1983)); see also United States v. Fee, 491 Fed.

59

Appx. 151, 157 (11th Cir. 2012) ("When an indictment contains more than one count charging a violation of the same statute, our inquiry concerns whether Congress intended the different acts underlying each count to constitute a separate offense."). This involves determining "'the allowable unit of prosecution.'" Smith, 231 F.3d at 815 (citation omitted); and see United States v. Jones, 2007 WL 2301420, at *10 (N.D. Ga. July 18, 2007) ("The principle underlying this rule is that the 'unit of prosecution' for a crime is the *actus reus*, the physical conduct of the defendant.").

The court interprets Defendant's attack on Counts Two and Four not to be that conviction on both counts would violate double jeopardy under the afore-stated Blockburger test. Frankly, reaching the conclusion that each § 924(c) count contains an element and requires proof of at least one fact not required to prove the other count is not difficult. To prove Count Two, the government must establish that the use, carry or possession of the firearm was in furtherance of a crime of violence, but, to prove Count Four, the government must establish that Defendant used, carried or possessed the firearm in furtherance of a drug trafficking crime. The facts that the Government must establish to support each charge, while overlapping, are also distinct. To prove Count Two, the government must establish that Defendant's use of the firearm was in furtherance of an assault on a federal officer in the performance of his duties. Those

60

facts are immaterial to proof for Count Four, that is, that Defendant's use of the firearm was in furtherance of his possession with the intent to distribute quantities of marijuana. The real issue before the court is whether a single use of a firearm charged in multiple § 924(c) counts constitutes an "'allowable unit of prosecution.'" Smith, 231 F.3d at 815 (citation omitted). Contrary to the Government's argument, the issue before this court has not been decided in the Eleventh Circuit Court of Appeals.

In Rahim, the defendant was charged with two counts of § 924(c) arising from his use of a single firearm based on these facts. On July 8, 2013, the defendant entered a bank, brandishing a firearm, and demanded money, which the teller provided, including dye packs. 431 F.3d at 755. After the dye packs exploded, the defendant abandoned his vehicle and entered a nearby store, where he demanded the keys to a female store employee's vehicle and, holding a gun to her head, ordered her to drive the vehicle. The defendant continued to hold the firearm to her head while they abandoned the vehicle and fled into some woods, where law enforcement eventually shot and subdued the defendant. Id. The court disagreed with the defendant's contention that "the statute does not permit two or more convictions under section 924(c) when the predicate crimes of violence arise from the same course of conduct." Id. at 757. While the court discussed cases in the Third, Sixth and Tenth Circuits

61

upholding multiple § 924(c) convictions "where the same predicate crimes of violence, bank robbery and carjacking occurred 'virtually simultaneously[,]'" Id. (quoting United States v. Casiano, 113 F.3d 420, 425 (3rd Cir. 1997); and citing United States v. Burnette, 170 F.3d 567, 571-72 (6th Cir. 1999); United States v. Romero, 122 F.3d 1334, 1343-44 (10th Cir. 1997)), the court also specifically stated that it "need *not* reach the issue whether predicate offenses consisting of 'virtually the same conduct' can support multiple 924(c) convictions because Rahim's convictions for bank robbery and carjacking required distinct conduct." Id. at 758 (emphasis added). The conduct underlying the multiple § 924(c) convictions in Rahim, occurring overtime and involving distinct and separate acts of using, carrying and possessing the firearm in different locations and against separate victims, is not similar to the alleged single act of Defendant Bates using, carrying and discharging the firearm in this case - which is "virtually the same conduct." Id.[20]

---

[20]In Abraham v. United States, 477 F. Supp. 2d 1232 (S.D. Fla. 2007), the decision in Rahim was discussed relative to the defendant's motion to vacate based on alleged ineffective assistance of counsel. He contended that counsel should have argued that consecutive sentences for two § 924(c) convictions arising from simultaneously committed predicate offenses, the kidnaping and assault of a postal worker, was unlawful. Id. at 1244-45. The court noted the decision in Rahim, and that court's discussion of the cases upholding multiple § 924(c) convictions for predicate conduct occurring virtually simultaneously, 477 F. Supp. 2d at 1244, but also noted that the Rahim court determined that "it need not reach the issue" while also citing to

AO 72A
(Rev.8/82)

The Eleventh Circuit Court of Appeals still has not spoken to the precise issue before this court despite the great amount of discussion in other circuits attempting to resolve what is the "allowable unit of prosecution" under § 924(c) when there is a simultaneous use of a single firearm resulting in the violation of two distinct predicate offenses, such as apparently alleged in this case. These cases, of course, do not constitute binding authority in this circuit but are illustrative of the difficulty of resolving the issue, especially before trial. The most thorough discussion of this topic is found in the *en banc* decision in United States v. Rentz, 777 F.3d 1105 (10th Cir. 2015), in which the court found (after dissecting the language of § 924(c)) that multiple § 924(c) convictions based on a defendant firing a single shot which hit and injured one victim but then struck and killed a second victim was one unit of prosecution and did not support multiple § 924(c) convictions. According to the court, each unit of prosecution requires a separate use, carry or possession of a firearm in

---

courts reversing multiple convictions under such circumstances, 477 F. Supp. 2d 1244-45 (citing Rahim, 431 F.3d at 758). The Abraham court rejected the defendant's ineffective counsel claim based on consecutive sentencing for multiple § 924(c) convictions arising out of the single use of the firearm. Id. at 1245. Tellingly, however, the court also noted that the "government *conceded* that this claim might merit relief in some circuits but argued that because the Eleventh Circuit has not yet ruled on this *precise* issue, counsel was not ineffective for failing to raise it." Id. (emphasis added).

63

conjunction with commission of a separate predicate offense. Id. at 1115.[21]  And in

Vichitvongsa, relying in large part on the decision in Rentz, the court found that the

defendant "took *one* affirmative firearm act (brandishing a handgun) while

simultaneously committing *two* predicate offenses (conspiring to commit Hobbs Act

robbery and to traffic drugs), and  [the court held that] this does not support *two* §

924(c) convictions." 819 F.3d at 267, 269 (The court, however, stated, "We emphasize

the narrowness of our decision . . . .  We do not hold that multiple crimes with one

firearm occurring during 'the same criminal episode' may support only one § 924(c)

charge. . . .   Whether a criminal episode contains more than one unique and

independent use, carry, or possession depends at least in part on whether the defendant

made more than one choice to use, carry, or possess a firearm.") (emphasis in

original).[22]

---

[21]This decision calls into question the continuing validity of the decisions in the Tenth Circuit allowing multiple § 924(c) convictions for the single use, carry or possession of a firearm resulting in distinct predicate crimes flowing from the defendant's conduct.  See, e.g., United States v. Floyd, 81 F.3d 1517, 1527 (10th Cir. 1996).

[22]The court in Vichitvongsa distinguished the prior holding of the court in United States v. Nabors, 901 F.2d 1351 (6th Cir. 1990), which held that multiple convictions for § 924(c) charges were not multiplicitous. 819 F.3d at 267-68.  In Nabors, defendant fired, using a shotgun, on federal agents attempting to execute a search warrant at his residence.  The subsequent search of the apartment resulted in the

AO 72A
(Rev.8/82)

Likewise, in <u>Finley</u>, 245 F.3d 199, and in <u>Wilson</u>, 160 F.3d 732, the circuit courts held that convictions on and sentencing for two § 924(c) charges was multiplicitous.   In <u>Finley</u>, immediately following an undercover drug sale, the defendant was found in his bedroom holding $390.00, in the room was found small plastic bags of cocaine, and in the kitchen was found a sawed-off shotgun.  The defendant was charged with distribution of cocaine and a § 924(c) charge for the shotgun found in the kitchen, and with possession with intent to distribute cocaine and another § 924(c) charge for the same shotgun.  <u>Id.</u> at 201, 206.  Stating that the offenses "were simultaneous or nearly so," the court held, "The statute does not clearly manifest an intention to punish a defendant twice for continuous possession of a

---

seizure of an additional pistol, ammunition and drugs and evidence of drug trafficking activity.  901 F.2d at 1356.  The defendant was charged with assaulting a federal officer with a deadly weapon and with possession of cocaine with intent to distribute and a § 924(c) count for each predicate offense.  The court, applying the <u>Blockburger</u> test, found that each § 924(c) offense required proof of a different predicate act.  <u>Id.</u> at 1358.  The court in <u>Vichitvongsa</u> explained the prior decision affirming the two § 924(c) convictions in <u>Nabors</u> as follows: that the predicate offenses were distinct requiring proof of different facts and that "[i]mplicit in this finding, however, is that Nabors used firearms twice, once to shoot a federal agent on the date police executed a search warrant, and once to 'facilitate and protect drug transactions' during his possession of cocaine."  819 F.3d at 268.  <u>Nabors</u> is arguably distinguishable from this case if no additional firearms or ammunition was found during the search of Defendant Bates' residence or if Defendant's use and carry in furtherance of the drug offense relates solely to the discharge of the firearm.

firearm in furtherance of simultaneous predicate offenses consisting of virtually the same conduct." Id. at 207.  And in Wilson, the defendant repeatedly shot killing a witness to an armed robbery of a post office resulting in charges for killing a witness, killing a witness with intent to prevent testimony and killing a witness with intent to retaliate and two § 924(c) charges for using a firearm in furtherance of a crime of violence.  160 F.3d at 736.  The court noted that, although there were two underlying predicate offenses charged, "there is only one firearm and one use . . . ." Id. at 749. The court found that "[h]owever many crimes [the defendant] may have committed by shooting [the witness], there was only one use (albeit a repeated use) of a firearm" and that one of the defendant's § 924(c) convictions had to be vacated.  Id.

In addition to Floyd and Nabors, cited *supra,* finding that "virtually simultaneous" use, carry and possession of a firearm resulting in multiple § 924(c) charges based on distinct underlying predicate offenses are not muliplicitous, two other cases discuss the virtually simultaneous use of one firearm resulting in two § 924(c) charges based on distinct predicate offenses.  In Casiano, 113 F.3d 420, the defendants, carrying weapons, decided to steal a car and soon thereafter observed a male near a van.  They approached, hit him in the head with the butt of a gun and forced him back into the van, continuing to threaten and use a firearm to pistol-whip the victim.  Upon

66

arriving at a remote location, the victim was forced out of the van and eventually shot. Id. at 422.  The defendants were charged with a conspiracy to commit carjacking and kidnaping, along with substantive counts of carjacking and kidnaping and two § 924(c) charges for using a firearm in furtherance of a crime of violence.  Id. at 423.  The Third Circuit Court of Appeals rejected the defendants' argument that their sentences on both § 924(c) charges were unlawful because "the criminal course of conduct from the carjacking (the first predicate offense) to the kidnaping (the second predicate offense) was continuous and involved only one victim."  Id. at 424.  The court noted that § 924(c) "speaks in terms of 'conviction,' not criminal episode" and that Congress "commanded that the enhancement would apply to 'any' crime of violence without regard to temporal considerations."  Id. at 424-25 (citation omitted).  The court stated, "It is unquestionable that crimes occurring as part of the same underlying occurrence may constitute separate predicate offenses if properly charged as separate crimes."  Id. at 426.

And in United States v. Andrews, 75 F.3d 552 (9th Cir. 1996), the Ninth Circuit Court of Appeals rejected the defendant's argument that her sentence for multiple convictions based on her use of a firearm resulting in underlying multiple predicate offenses occurring "at virtually the same time" was unlawful.  Id. at 557-58.  In that

67

case, the defendant, along with several other individuals, decided to retaliate for earlier events and confronted the vehicle containing several of their antagonists. Id. at 554. After one of the defendant's cohorts shot one man, the defendant "approached the car and-despite seeing something moving in the back of the car that she later admitted was obviously a person-began firing into it." Id. One person was killed and two others were injured. Id. Pertinent to the issue before the court, the defendant was convicted of second degree murder and attempted voluntary manslaughter of the two injured individuals and of three counts of using a firearm in furtherance of the three predicate offenses. Id. at 554-55. The court held that because the defendant's underlying crimes were properly charged as separate offenses, "each of her [three] 924(c) convictions is proper based on a separate predicate offense." Id. at 558. Although finding "much force to [the defendant's] policy argument," the court also rejected her contention that, because "the underlying predicate offenses occurred virtually simultaneously[,] . . . imposition of the enhanced penalty designed for repeat offenders makes no sense in a case like hers, where there was no time for her to reflect and understand the consequences of enhanced penalties . . . ." Id.

In addition to the various approaches by which courts, none binding in this circuit, evaluate the issue of multiplicity after trial and based on the specific facts of

68

each case, the court notes that Defendant seeks the wrong remedy.  As stated in United States v. Smith, 591 F.2d 1105 (5th Cir. 1979), "An indictment . . . charging the same offense in more than one count is multiplicitous, but this also is not fatal and does not require dismissal of the indictment." Id. at 1108 (citation and internal quotation marks omitted).  Noting that "there are less severe remedies available to alleviate potential prejudice," the court in United States v. Melvin, 2015 WL 7116737, at *14 (N.D. Ga. May 27, 2015), report and recommendation adopted by 143 F. Supp. 3d 1354, 1382 (N.D. Ga. 2015), stated that appropriate instructions to the jury could alleviate potential prejudice and that, if the evidence at trial actually establishes multiplicity, any violation could still be remedied "by consolidating counts or requiring dismissal . . ." Id. (citation and internal quotation marks omitted); and see United States v. Williams, 2015 WL 9999192, at *8 (N.D. Ga. December 27, 2015), report and recommendation adopted by 2016 WL 447844 (N.D. Ga. February 4, 2016) (same); United States v. Pefanis, 2011 WL 1134310, at *3 (N.D. Ga. March 1, 2011), report and recommendation adopted by 2011 WL 113954 (N.D. Ga. March 25, 2011) (same). Furthermore, "even after a verdict, any error may be remedied by vacating multiplicitous convictions and any concurrent convictions based upon those convictions." Melvin, 2015 WL 7116737, at *14 (citation and internal quotation

69

marks omitted); and see Smith, 591 F.2d at 1108 ("The principle danger in multiplicity is that defendant will be given multiple sentences for the same offense.  A remedy is available at any time if defendant is given multiple sentences.") (citation and internal quotation marks omitted).[23]

Contrary to the relief Defendant seeks, pretrial dismissal of neither Count Two nor Four is appropriate.  The evidence at trial may or may not support Defendant's argument that his single discharge of the firearm supports both § 924(c) counts.  If the District Court determines that the counts may be multiplicitous in light of the decisions discussed *supra*, then the court may require the Government to elect which count to present to the jury with appropriate jury instructions or the District Court may consolidate the counts for sentencing.  Whether any relief is appropriate, including, dismissal of one of the counts at the close of the evidence or vacating a conviction after trial, is a decision best left to the sound judgment of the District Court.

---

[23]In United States v. Cazy, 618 Fed. Appx. 569 (11th Cir. 2015), the defendant asserted error because the trial court denied the motion to vacate one of his § 924(c) firearm possession convictions as multiplicitous.  The defendant alleged that "both convictions are based on precisely the same conduct-possessing firearms immediately before they were supposed to carry out the stash-house robbery." Id. at 573.  The court held that "any claimed multiplicity does not require reversal in this case because the district court imposed concurrent sentences for the two firearm possession convictions." Id.

**III.    Conclusion**

For the foregoing reasons and cited authority, the court **RECOMMENDS** that Defendant's motion [Doc. 114] to dismiss Counts Two and Four be **DENIED**.

<u>**Conclusion**</u>

Accordingly, the court **RECOMMENDS** that Defendant's motion [Doc. 92] to suppress and motions [Docs. 90, 112 and 114] to dismiss be **DENIED**.

There are no other pending matters before the Magistrate Judge, and the undersigned is aware of no problems relating to the scheduling of this case.

**IT IS THEREFORE ORDERED** and **ADJUDGED** that this action be and the same is hereby, declared Ready for Trial.

**SO ORDERED AND RECOMMENDED** this 1st day of June, 2017.

JANET F. KING
UNITED STATES MAGISTRATE JUDGE